Syllabus.

5   163
28  202
28  277
5   163
36   92
39  605

## MICHAEL TOONEY v. THE STATE..

1. NEW TRIAL. — Application for new trial was properly denied when the newly discovered testimony upon which it was based was intended to impeach a witness.

2. NEWLY DISCOVERED EVIDENCE. — Application for new trial based upon newly discovered evidence, which, with due diligence, might have been had, was properly overruled. It is not sufficient that the application shows that the newly discovered evidence will reach the facts stated. It must show, also, the source of information.

3. CONTINUANCE. — When the statutory requirements are fully complied with in an application for a first continuance, it is a matter of right. Attachment for a witness living in the county cannot issue until a subpœna has been disregarded.

4. SERVICE. — An officer's return on a subpœna which comprises several witnesses should distinctly show the names of the witnesses served, and also the names of the witnesses *not* served. "Served by reading in hearing of," is not correct. The return should show service by "reading to" the witness.

5. MALICE AFORETHOUGHT. — The Penal Code gives no definition of "malice aforethought." The highest judicial tribunals, however, have established for it a signification more comprehensive than deliberate malevolence, enmity, ill-will, or revenge; and have so extended its meaning as to include all states of mind in which a homicide is committed without legal justification, extenuation, or excuse.

6. EXPRESS AND IMPLIED MALICE. — An actual and deliberate intention unlawfully to take the life of another, or to do him some great bodily harm, from which death might probably result, constitutes express malice. Implied malice is not a fact, but an inference or conclusion deducible from particular facts and circumstances, judicially ascertained.

7. MURDER BY POISON. — Article 608 of the Penal Code (Pasc. Dig., art. 2267) declares that "all murder committed by poison * * * is murder in the first degree." This is not to be understood as dispensing with the malice aforethought, which is the distinctive characteristic of all murder, and as indispensable to constitute murder by poison as by any other means. But a homicide committed with malice aforethought, and by means of poison, is by this provision of the Code made murder of the first degree, whether the malice be express or implied.

8. SAME. — Note in the opinion the collocation of the provisions of the Penal Code on offences committed by poison.

9. SAME. — Article 537 of the Penal Code (Pasc. Dig., art. 2198) defines the offence of mingling poison with any drink, food, or medicine, "*with intent to kill or injure any other person;*" and the next article enacts that if any

one shall, *"with intent to injure,"* cause another to inhale or swallow any substance injurious to health or to any of the bodily functions, or shall administer such substance *"with intent to kill,"* he shall be punished, etc. The succeeding article provides that if, within one year, death ensues from such acts, " the offender shall be guilty of murder, and punished accordingly." *Held,* that a murder so committed would, by virtue of article 608, be murder of the first degree.

10. SAME — CHARGE OF THE COURT. — In the trial of an indictment for murder, based upon said articles 537 and 538, the charge to the jury should instruct them to determine whether or not the poison was "mingled or administered *with the intent to kill or injure"* the deceased.

11. SAME. — In like manner, in the trial of an indictment for murder based on said article 608, it is necessary that the charge to the jury should define or explain "malice aforethought."

12. SAME. — Indictment for murder by poison did not allege an attempt to rob. *Held,* error to instruct the jury to consider whether such was the intent, and thus submit to them an issue not presented in the indictment. To be legal, the charge must meet and be limited by the case made by the indictment.

13. ACCOMPLICE'S TESTIMONY. — The statute requires the corroboration of an accomplice to be by evidence tending to connect the defendant with "the offence committed," not with the offence *charged.*

APPEAL from the District Court of Tarrant. Tried below before the Hon. J. A. CARROLL.

On October 15, 1877, appellant, together with Joe Wright and Arch Johnson, was arrested and confined in the county jail of Tarrant County, and subsequently, on March 23, 1878, was indicted for the murder of W. P. Barton, on October 13, 1877, by administering poison in a glass of beer. Wright and Johnson escaped prosecution by turning State's evidence.

The *post-mortem* examination disclosed the presence, in the stomach of deceased, of small " reactions " of morphia and laudanum. Beyond this, and the evidence of the witnesses Wright and Johnson, the testimony for the State is inconsequential.

Wright, sworn, says that, on the day charged in the indictment, deceased came into the saloon of Johnson,

where witness was tending bar, and, after drinking a glass of beer, went with appellant, at appellant's request, into the rear room of the saloon, which was then used for the purpose of gambling; that shortly afterwards the two were followed into the room by Arch Johnson, when the door leading into the bar-room was locked from the inside, or gambling-room; that in a half-hour appellant came out and asked witness to go and purchase for him 25 cents' worth of morphine, and in another half-hour asked witness to purchase for him 25 cents' worth of laudanum, both of which purchases witness made and gave to appellant, giving him at each time three glasses of beer; that, about three o'clock, witness saw deceased seated at the table in the gambling-room, seeming very drunk; that appellant remarked that "that man was very drunk," and he "wanted him out of there;" whereupon witness, with assistance, took deceased out.

On cross-examination, says that he bought the morphine and laudanum, knowing what appellant wanted it for, and that he assisted appellant in conveying deceased out of the saloon.

Johnson testified that he first saw the deceased, on the day charged in the indictment, drinking with the appellant in the middle, or gambling-room of witness's saloon. When witness entered, appellant asked him to " open up a game," which witness did, winning two several sums from the deceased. Witness thereupon left the saloon, and when he returned, shortly afterwards, he saw appellant receive from Wright two glasses of beer, and an ounce phial containing some dark liquid, which the appellant shook, turning from the witness. Witness then left the appellant and deceased alone in said gambling-room, and when witness returned, on the same day, the appellant told witness that he (appellant) and Wright had taken the deceased out back of the saloon, and that the police had taken deceased.

Cross-examined, says that he has followed the avocation of a gambler, and always won, — that the " bank " always wins.

Witness Ham testified that he came into the saloon with deceased, and while standing at the bar, he saw a man come to the door of the gambling-room and beckon to the deceased, and that deceased went into the room with him. Witness thinks he can identify the appellant as the man who beckoned.

The testimony of the witnesses Thomas and Woody is identical. It is to the effect that they found the deceased lying on his back, about thirty yards in the rear of the saloon, evidently drunk, but protesting that he had been drugged, and dragged there, and was not drunk. They conveyed him to the calaboose, where he died during the night of the 13th. They discovered tracks leading from the back door of the saloon to where the deceased lay, as though made by dragging the deceased's feet along the ground. They saw the appellant about the saloon pretty much all that day. One of these witnesses testified that appellant has been generally regarded as a " capper " or " roper " for this saloon. By both of these witnesses it was testified that, when found, the deceased's pants were unbuttoned, and one pocket was turned wrong side out.

The appellant offered in evidence the first affidavit of Wright, taken before the coroner's inquest, in which he swore that he had never seen the deceased previous to the inquest, and followed this up by introducing his second affidavit, taken before the same inquest, — having been recalled. In this he stated that the deceased came into Johnson's saloon, where he was tending bar, with Ham and Patton, on the day charged in the indictment; that the three took a drink, when " English Tom " asked deceased to " come into the back room;" that they went in, sat down, and called for beer; that they drank for the half of

an hour, when "English Tom" came to the window and asked witness to get him 20 cents' worth of morphine, not saying what he wanted with it, and that he (Wright) went and got it at the City Drug Store; that directly afterwards "English Tom" called for a couple of glasses of beer, and that he (Wright) put the beer on the ice-cooler, and "English Tom" came and got it, and called for more, and asked him (Wright) to go and get him 25 cents' worth of laudanum; that he went and got it for "English Tom," and gave him, with it, two more glasses of beer, and shortly afterwards "two whiskies," and then more beer; that about this time Johnson came through and went into the same room, saying he was going to feed his horses; is satisfied that Arch Johnson was in the room, for he saw him there, playing cards with the deceased and "English Tom," and he afterwards told him (Wright) that he had won $33 from the deceased. This was about twelve o'clock. "English Tom" went out about one or two o'clock, and witness only saw the deceased in the room. About three o'clock "English Tom" came in the back way, the middle door being locked, and said he must have deceased out of there, as he was drunk; whereupon he ("English Tom") carried deceased out the back way. "English Tom" and Arch Johnson were the only persons in the room with deceased, and they remained in there about one hour and a-half. Arch Johnson was in the room with the deceased and "English Tom" when witness handed in the laudanum.

In his first testimony before the coroner's inquest, here given in evidence by appellant, A. B. Johnson swore that deceased looked like a man he saw in his saloon on the day charged in the indictment. Thought him drunk at the time. Saw him again that day, sitting down in the room adjoining the saloon, and left him sitting there when he went to dinner. Mr. Wright was the only person in the saloon when witness saw the deceased there. Next time he (Johnson) saw the

deceased was in the calaboose. Saw deceased take a drink of beer in the saloon.

In his first testimony taken before the court, on the trial of a writ of *habeas corpus*, here given in evidence by the appellant, Johnson swore that he first saw deceased in his saloon on the day charged; that when he went to dinner, a few minutes later, he saw him in the room adjoining the saloon, sitting at a table with appellant, drinking beer. Witness saw the appellant have in his hand at the time a small phial, containing, he thought, a dark liquid. Appellant's back was turned to deceased. Witness did not stay in the room, but passed out, returning to the saloon about five o'clock. Saw Barton next day, dead. Saturday evening (13th) appellant told witness that he and Joe Wright had taken the deceased out of the back door, and the police had got him. Thought deceased was drunk when he (Johnson) saw him. In his cross-examination, Johnson denied having had a conversation with Thomas Watson, while in jail, in which he requested Watson to swear, on the final trial, that he (Watson) came to the back part of the house and saw appellant and deceased together in the middle room, and that he (Johnson) was not there, telling Watson that he (Johnson) was a citizen, and could benefit him (Watson), and that appellant was a stranger, and they could throw all the blame on him. Might have said to Watson that Wright was "kicking about this thing," and threatening to come back and testify against witness unless witness sent him money, but thinks he never made such remarks.

Thomas Watson was introduced by appellant, and swore that a conversation substantially as set out above did occur, and that the proposition embodied was made to him by Johnson.

William Ferguson and James Alford, witnesses for appellant, never heard Johnson's reputation for truth and veracity called in question.

The jury found the appellant guilty of murder in the first degree. A new trial was asked by appellant, upon the ground, among others, of newly discovered evidence, the substance of which was as follows:

The application states that, though unable to procure the affidavit of Ben Patton, who is a resident of southern Texas, his testimony can be had by next term of court, when he will swear, in the event of a new trial, that he (Patton) met deceased and the State's witness Ham about nine o'clock A. M. on the day of the alleged poisoning, and went with them to the bank, and was with them until they went to Johnson's saloon, when he saw Johnson and deceased go into the gambling-room alone, and lock the door after them; and that the appellant was not then in the saloon, nor did he, as alleged, enter the saloon or room with Ham and the deceased; nor was he there from the time Ham, the deceased, and Patton entered the bank to the time they went to the saloon; nor was he in the middle room, or about the saloon; nor did he aid, assist, or administer poison to the deceased. All of which appellant says is true.

The affidavits of Elliston and Watson set out that they, with the appellant, and Ham, Wright, and Johnson, were arrested and confined in jail under this charge, but were subsequently released, and that in the event of a new trial they will swear that, while so confined in jail, in the course of a conversation conducted by Ham and these two witnesses jointly, Ham told them, at one and the same time, in the hearing of each other, that he (Ham) had never seen appellant before he saw him in jail, and that the man who beckoned the deceased into the gambling-room was a large, heavy-set man, and he (Ham) did not believe that appellant was the man. To all of which these affiants say they will testify in the event of a new trial, and that it is true.

The affidavit of Parker sets out that, on the morning of October 14, 1877, the witness Ham came to affiant's place

of business and asked if affiant had seen the deceased that day, saying that he (Ham) was uneasy about deceased ; that he had paid deceased $800 in money, and that deceased's nephew had given deceased $400 to keep for him. Ham further said to affiant that he had bought cattle from deceased, for which he had given his note for $1,000, on which the $800 was a payment, but which was not put on the note, as deceased did not have it with him. Ham further stated to affiant that the last he had seen of deceased was in the Fort Worth wagon-yard, on Saturday, October 13th, about three o'clock P. M., and that he (Ham) wanted deceased to stay there, but deceased would not do it; and he (Ham) was now uneasy about him, as he had not seen him since that time. All of which affiant says is true, and that so he will testify if a new trial is granted. The motion was overruled.

The charges of the court below, involved in the rulings of this court, are stated in the opinion.

*Brown & Watts*, and *McCart & Middleton*, for the appellant. The first error complained of by the defendant is the overruling of his motion for a continuance. The defendant was indicted for murder, on March 23, 1878, and served late that day with a copy of the indictment; and on the 25th day of said month the defendant applied for subpœna for the witnesses Mrs. Jones, J. W. Ralhkay, Thomas Mahoney, and Frank Kinch, with other witnesses who were served; the above witnesses not found in Tarrant County. The defendant states, in his affidavit, that all of said witnesses were residents of said county of Tarrant; that the 24th day of said month was the Sabbath. The materiality of the testimony of the witnesses Mrs. Jones, Ralhkay, Mahoney, and Kinch, we think, cannot be questioned, as set forth in defendant's affidavit, especially when we consider the testimony against him. Then, the only

question that presents itself is, Did the defendant show due diligence? The defendant shows that at the time he was served with a copy of the indictment he was confined in the county jail of Tarrant County; that as soon as a subpœna could issue he applied for the proper process, a subpœna for his witnesses; and that the same was returned into court on the same day, March 25, 1878, the above-named witnesses not found.

In 35 Texas, page 359 (*Landers* v. *The State*), is a case very similar to the one at bar in regard to the time of indictment, application for process, and trial. Indicted October 11, 1871, process issued on October 12th, and tried on October 19th. In the case at bar, defendant was indicted on March 23d, process applied for on March 25th, and motion for continuance overruled on April 3, 1878, and defendant on the same day went into trial. In the case of *Henderson* v. *The State*, 22 Texas, 595, where the motion for a continuance did not state the residence of the witness, but where it showed that the time of the issuing of process and trial of cause was similar to the one at bar, the court say that it was not sufficient for a second application is too clear for comment. From the language, we may reasonably infer that it would have been sufficient for the first application, although the residence of the witness was not stated in the motion.

We think the application in the case at bar complied with the law; that the testimony was material; that we used due diligence, and complied with all the requisites for a motion for the first continuance.

The court erred, in its second and fourth charges to the jury, in charging anything about robbery, the indictment not charging the defendant with giving the poison for the purpose of robbing the deceased; and there is no evidence to that effect.

The court erred in giving the jury the eighth instruction.

The court, in this instruction, charged the jury that, to warrant a conviction on the testimony of an accomplice, said testimony must be corroborated in some material point tending to connect defendant with the offence charged.

It should have gone a step further, and told the jury that the corroboration is not sufficient if it merely shows the commission of the offence. Under the instruction as given, the jury would be warranted in finding the defendant guilty upon the evidence of the accomplice solely, although there was no corroborating evidence to the commission of the crime, provided the accomplices were corroborated as to some point tending to connect the defendant with the offence charged. We understand the law to be that there must be corroborating evidence both as to the *corpus delicti* and that the defendant committed the offence; and, if such is the law, it would evidently follow that an instruction would be bad, should it require the jury to find a defendant guilty upon corroborating evidence as to one of these points only.

Again, the instruction is bad in this: that the jury are warranted in finding the defendant guilty upon the testimony of an accomplice, if said testimony is corroborated upon any material point tending to connect the defendant with the offence *charged*. It should have, in the place of the word " charged," used the word " committed."

There may be, and often is, a considerable difference between the offence " committed " and the offence " charged."

The court charged the jury in the tenth and last instruction as follows:

" You are the exclusive judges of the credibility of the witnesses."

We insist, under the facts in this case, first, that said instruction is not the law; and, secondly, that it was misleading.

The seventh instruction tells the jury that they are not

warranted in convicting the defendant upon the uncorroborated evidence of an accomplice. The tenth instruction, in clear, succint, and forcible language, tells them they are the exclusive judges of the credibility of the witnesses. If this is the law, then, the jury being the exclusive judges of the credibility of all witnesses, they could, under the charge (contrary to the law), find the defendant guilty upon the evidence of an accomplice solely. Now, which instruction shall they follow? Who is able to say which instruction they were guided by? Are we justified in saying, when a man's life is at stake, that they were guided by the seventh instruction? The tenth instruction, being the last, and short, clear, and forcible, would make more impression upon the minds of the jury than an instruction given in the middle of the judge's charges.

The seventh and tenth instructions are diametrically opposed to each other. Both cannot stand. If the seventh instruction was the law in this case (and there can be no doubt of that, under our statute), the tenth instruction is not and cannot be the law in this case. It was error to give it to the jury, and the defendant's rights have been prejudiced thereby.

In some cases the jury are the exclusive judges of the facts proved, and of the weight to be given to the testimony; but in the case at bar, our statute, in positive language, says the jury shall not be the exclusive judges of the credibility of the witnesses. Article 3118 says: "A conviction cannot be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the offence committed; and the corroboration is not sufficient if it merely shows the commission of the offence."

Article 3108 says: "The jury in all cases are the exclusive judges of the facts proved and the weight to be given to the testimony, except when it is provided by law that

proof of any particular fact is to be taken as either presumptive or conclusive proof of the existence of another fact, or where the law directs that a certain degree of weight is to be attached to a certain species of evidence.''

In *Coleman* v. *The State*, 44 Texas, 111, the court says : '' However much a jury may be disposed to credit the accomplice, the defendant cannot be convicted unless the evidence of the accomplice be confirmed in some material matter tending to show the defendant's guilt.''

This tenth instruction, tested by articles 3108 and 3118, and a great many decisions of our Supreme Court and the Court of Appeals, is bad law.

It is well settled law that the jury are the exclusive judges of the weight to be given to the witnesses, with the exceptions stated in article 3108.

The evidence coming from an accomplice is so corrupt, so unreliable, and, in the eye of the law, so infamous, that our statute says that jurors shall not credit accomplices ; they shall not be the exclusive judges of the weight to be given to their testimony ; and the decisions of our Supreme Court have, time and again, affirmed this doctrine.

The tenth instruction wipes out articles 3108 and 3118, and all the decisions of our Supreme Court upon the subject of accomplices.

In *Brown* v. *The State*, 23 Texas, 200, the court say : '' The jury are the exclusive judges of the weight to be given to the evidence, unless a certain degree of weight is attached to a certain species of evidence, as that a conviction cannot be sustained upon the uncorroborated evidence of an accomplice ; and it is the duty of the court to instruct the jury upon their legal presumption and degree of weight.''

In *Foxdale* v. *The State*, 9 Humph. 411, the court say : '' If the testimony in a capital case be not free from doubt, and there is reason to suppose that the jury have been misled by the court in charging them as to the evidence, a

new trial will be granted, notwithstanding the charge was correct in point of law."

When instructions are contradictory there should be a new trial. *The People* v. *Anderson*, 44 Cal. 65 ; *Spevey* v. *The State*, 26 Ala. 90.

An erroneous instruction is not cured by a correct instruction upon the same point. *Mackey* v. *The People*, 2 Col. 13 ; *Bradley* v. *The State*, 31 Ind. 492 ; *Kingen* v. *The State*, 45 Ind. 519.

It is the bounden duty of the judge, under our statute, to deliver to the jury a written charge, in which he shall distinctly set forth the law applicable to the case ; and, moreover, to state plainly the law of the case. Pasc. Dig., arts. 3059, 3060 ; 5 Gray, 80.

We ask your honors, Has the law of the case been plainly stated to the jury?

A conviction cannot be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the offence committed ; and the corroboration is not sufficient if it merely shows the commission of the offence. Pasc. Dig., art. 3118.

Accomplices are considered, in law, odious ; they are ranked under the class of persons infamous. The reason is, that such a person is morally too corrupt to be trusted to testify, — so reckless of the distinction between truth and falsehood, and insensible to the restraining influence of an oath, as to render it impossible that he will speak the truth at all. Of such a person Chief Baron Gilbert remarks that the credit of his oath is overbalanced by the stain of his iniquity.

At the common law, the degree of credit which ought to be given to an accomplice was a matter exclusively within the province of the jury. They could convict upon the evidence of an accomplice without confirmation ; but this law was softened by the judges, and it became the practice

not to convict a person upon the sole and uncorroborated testimony of an accomplice.

As to the manner and extent of the corroboration, learned judges are not perfectly agreed.    But the great weight of authorities hold that the corroboration must be as to material matters, requiring not only confirmatory evidence as to the *corpus delicti*, but also that the prisoner committed the crime.

The source of this evidence is so corrupt that it is always looked upon with suspicion and doubt, and is deemed unsafe to rely upon without confirmation.    Therefore our statute requires, not only corroborating evidence as to a crime having been committed, but that the prisoner committed said crime.    Pasc. Dig., art. 3118.

Two or more accomplices, produced as witnesses, are not deemed to corroborate each other; but the same rule is applied, and the same confirmation required, as if there were but one.    *Johnson* v. *The State*, 4 Greene (Iowa), 65; 1 Greenl. on Ev. 381.

Proving by other witnesses that robbery was in fact committed in the mode in which an accomplice stated it to have been done is not such confirmation of him as is required to warrant a conviction on his evidence.    It is no confirmation at all, said the judge, as every one will give credit to a man who avers himself a felon for at least knowing how the felony was committed.    *Rex* v. *Webb*, 6 Car. & P. 595; *Rex* v. *Wilkes*, 7 Car. & P. 272.

New trials have been refused when the verdict was obtained on the uncorroborated testimony of an accomplice, but if a conviction be had on the testimony of an accomplice whose credibility is otherwise impeached, a new trial should always be granted.    1 Whart. Cr. Law, 7th ed., sec. 785, and cases cited.

The court erred in refusing to grant a new trial on account of newly discovered testimony.    While we are

aware that it would not be sufficient cause for a new trial to contradict or impeach a witness, yet in this case the newly discovered testimony of Thomas Elliston, Thomas Watson, and John F. Parker all go to show that the witness for the State, Joel E. Ham, upon whose testimony the State must rely as corroborating the accomplices, Wright and Johnson, was himself an accomplice, and in fact the moving spirit.

In the case of *G. F. M. Company* v. *Mathews*, 5 N. H., 574, the court held that a new trial should be granted, where one of the witnesses of the party in whose favor the verdict was had been convicted of perjury in the cause, on his own confession. We must confess that we cannot see that there is any difference between a confessed perjurer and one proved to be such; and if Joel E. Ham be an accomplice in this case, where is the testimony to corroborate the accomplices Wright and Johnson? Certainly the testimony of Woody and Thomas does not tend to connect this defendant with the killing of Barton.

But, to return to the testimony newly discovered: we think that said testimony is material, and that the same would probably change the result of the trial, and that the same is not cumulative. While circumstances did point to Joel E. Ham as an accomplice or accessary, there was no direct testimony to that fact. Joel E. Ham and deceased were strangers in the city of Fort Worth; came there for the purpose of "getting grub," in his own language; yet after the death of deceased he left the city, leaving his fellow-traveller unburied and in the hands of the coroner. He made no effort to find out who murdered his friend; did not appear before the coroner until forced to do so by arrest. We do not find him hunting for his friend after he was missing. Ham was the only person that knew that the deceased was possessed of money; and when asked by a nephew of deceased if he did not owe the deceased money, Ham falsely

stated that he did not.   With all these circumstances tending to show that Joel E. Ham was an accessary to the murder, we ask the court if the newly discovered testimony is not material, and that the same would probably affect the issue of this cause.   We respectfully refer the court to the affidavits of Wilson, Watson, and Parker.

Johnson and Wright testified only on condition that they were not to be prosecuted.   The record shows conclusively that they were accomplices.   It should not have been left with the jury to find or say whether or not they were accomplices.   The jury might say that Johnson and Wright, or one or the other of them, was not an accomplice, and hence they would convict upon his or their evidence, without any corroborating evidence.   The State being estopped from denying that Wright and Johnson were accomplices, it was error for the court to leave it for the jury to find. The verdict of the jury was contrary to the law and the evidence.   The State witnesses in the case are Johnson and Wright, and upon the testimony of these two men the defendant is convicted of murder in the first degree.

We desire briefly to picture the two men, as they are shown by the record.   If your honors will simply read the testimony of these two men, as shown in the statement of the facts and their testimony before the coroner's inquest, and upon the *habeas corpus* trial, you will see that they confess themselves to be bad and dangerous men, and unworthy of belief.   The best and the strongest argument we can make upon the evidence of these two men is to ask your honors to first read the testimony of Wright and Johnson taken before the coroner's inquest, and their evidence in the trial of the case.   If they told the truth then, they lied most foully now; and if the testimony now is true, they lied most basely at the coroner's inquest.   So, they perjured themselves in either one trial or the other; and who can say, with any degree of satisfaction, this is the truth and this is

the falsehood? The truth is, they are liars, and the truth is not in them.

*George McCormick*, Assistant Attorney-General, for the State. The motion for new trial was properly overruled.

1. Because the evidence sought, as appears from the affiadavits of the three witnesses, attached to the motion, was intended to impeach the witness Ham, by showing that he had made other and different statements than those made on the trial of the case.

2. Because the application does not show what diligence the accused used, if any, to find out the facts he says he can now prove by the witness Patton, whose residence he does not know. Nor does the application show how affiant is informed, or upon what he bases his statement, that Patton would testify as he states ; and because he desires the testimony of Patton to impeach the testimony of other witnesses, and show an *alibi*.

Upon these questions see *Love* v. *The State*, 3 Ct. App. 501, and authorities cited.

The record shows that the facts of this case had twice been under investigation before the courts before the trial that resulted in this conviction, and that, therefore, appellant must have known the necessity of procuring evidence for his defence.

That he was confined in jail will not excuse the use of diligence in procuring the attendance of witnesses. *Cox* v. *The State*, 43 Texas, 101.

It is further shown that the witnesses resided in Tarrant County, and no diligence was used to secure their attendance except the issuance of a subpœna, which was issued and returned on the same day. To whom issued or delivered, or by whom returned, does not appear.

Again, it is submitted that the mere issuance of the subpœna was not sufficient, when the facts, as in this case, show it had been disobeyed.

Article 2907 requires an attachment when the subpœna has been disobeyed, and article 2914 declares when a subpœna is to be considered as disobeyed.

The application does not show why an attachment was not procured for the defaulting witnesses, as was clearly the duty of appellant to have done unless the witnesses were present on the day set apart for taking up the criminal docket, or any day subsequent thereto, and before the disposition of this case.

Although the witnesses had been subpœnaed, yet if they did not attend the court before the case was called, it was the duty of the prisoner to have had them attached; otherwise, he has not used the diligence required by law. Pasc. Dig., arts. 2914–2987.

It is further submitted that, to bring the application in question within the requirement of the statute, it appearing that the witnesses were not present when the case was called for trial, it should have been shown that the witnesses had been present, as prescribed in Paschal's Digest, art. 2914.

The witnesses having failed to appear, it was the duty of the defendant to have had an attachment issued forthwith for them; and, having failed to use the power of the courts in enforcing their attendance, he is not entitled to a new trial by reason of their absence. Pasc. Dig., art. 2907.

The Code (Pasc. Dig., art. 2198) provides that "if any person shall mingle any poison, or any other noxious potion or substance, with any drink, food, or medicine, with intent to kill or injure any other person," etc.

And the succeeding article declares that if, by reason of such offence, the death of a person is caused, such offender shall be deemed guilty of murder, etc.

Now it is submitted that, the Code having declared (Pasc. Dig., art. 2267) that all murder committed by poison is murder in the first degree, the intent to kill or murder need not exist in the mind of the slayer at the time he

so administers the poisonous substance. The fact being shown that the poisonous potion was administered with intent to kill, or injure any of the functions of the body, death resulting therefrom is conclusive of the grade of the crime.

In the case at bar it may be insisted (following the rule laid down by this court in *Stapp* v. *The State*, 3 Texas Ct. App. 138, where it was held that the proof did not show that the wound given by the prisoner was necessarily fatal, and, therefore, he was rightly convicted of the offence of assault with intent to murder) that the poison administered by the prisoner in this case was either not given with intent to kill or injure, or was not, in fact, necessarily fatal to the deceased; and that, therefore, the court should have given in charge to the jury the law punishing the administering of poisonous and injurious potions.

That is, if the evidence adduced in this case could have raised the question whether the deceased died from the effects of the poison, then the law permitting a punishment for the less offence should have been given to the jury; and that the prisoner should have had the benefit of such doubt, and his conviction not to have been made to entirely depend upon his having administered the poisonous drug.

In reply to this, I submit that murder committed with poison constitutes a distinct class of crime; it is an offence of such great enormity, so readily committed, and so difficult of detection, that our law-makers intended to prevent such crimes by placing the most severe punishment of which the law was capable upon those who would use poison to injure. Therefore they have provided that when poison is administered *at all*, with intent to injure, and death results thereby, *such killing* is murder, and such murder is murder of the first degree.

Again, it having been shown in the case at bar that the poison was administered with intent to injure the deceased,

it is no defence that the poisoner did not intend to murder. For the statute declares such administering with such intent, of itself, to be murder; and the general principle of law being, if among all the motives leading to a particular intentional illegal act, one motive is to violate the law, this is sufficient to lend to the act the essential evil intent, no matter how strong may be other concurrent intents. Whart. Cr. Law, 561, sec. 670; Pasc. Dig., art. 1655.

In this case, if the intent with which the poison was given was illegal, and death resulted thereby, such offence is murder; for it must be presumed that the poisoner intended the natural and probable consequence of his acts.

The only question, as an examination of the record will show, arises upon the evidence, and particularly that portion of the evidence corroborating the testimony of the accomplices, and tending, otherwise than by their testimony, to connect the prisoner with the commission of the offence.

The statement of facts shows that the witnesses Johnson and Wright are principals with defendant in the crime charged. Indeed, it is to be regretted that such infamous characters as they should by any means escape the penalty for their crimes. Not only from the evidence does it appear that these men are murderers, but also that they have been guilty of wilful and corrupt perjury.

Notwithstanding all this, the weight and credit to which their testimony is entitled was a matter entirely for the jury, and this court cannot interfere if they were corroborated by facts tending to connect the prisoner with the commission of the offence charged.

Now, how and to what extent were they corroborated?

1. The deceased was found lying near the back door of the saloon, under the influence of a poisonous drug, and the condition of things showed he had been dragged there from the saloon, and thrown down upon the ground.

2. The testimony of the witness Thomas, the policeman,

shows that after he had put the deceased in the lock-up, he met the prisoner, and asked him if he knew where Tom Watson was, and that he answered he did not; and that afterwards the prisoner went to the witness and asked him what he wanted with Watson, and when told, said: "If that is all you want, I can tell you; I thought you wanted him about the man you put in the *calaboose*."

Why did the prisoner feel such an interest in the man who was put in the calaboose, and why seek to mislead the officer about Watson, who, it is shown, participated in the murder?

3. The testimony of the officer shows that he had "always seen the prisoner about the saloon where the murder was committed," and that he was what is called, in common parlance, a "decoy duck," used to induce men to enter this saloon.

4. The prisoner was seen in the saloon several times on the day of the murder.

5. The witness Ham says that defendant is the man who beckoned the deceased into the room where he was afterwards drugged and robbed. He described the appearance of defendant at the time; and this fact is corroborated by other witnesses.

It is, therefore, respectfully submitted that these facts and circumstances tend, when taken in connection with the other evidence in the case, to connect the prisoner with the commission of the offence. See the able opinion of this court in *Jones* v. *The State*, 3 Texas Ct. App. 575, and the authorities therein cited.

That the deceased died from the effects of the poison so administered is abundantly shown, both by the circumstances of his death, his physical condition soon after it was taken, and the testimony of the medical witnesses. Mr. Greenleaf says: "It is sufficient if the jury are satisfied, from all the circumstances, and beyond a reasonable doubt, that the death was caused by poison, administered by the prisoner."

And this is the rule, although the particular kind administered is not shown, nor that a sufficient quantity to cause death was shown to have been found in the body of the deceased.    3 Greenl. on Ev., sec. 135.

Again, although the presence of poison in the stomach does not prove the *corpus delicti*, yet when, as in this case, the inference is strong, and the concurrent evidence of the symptoms of the disease of such a nature as to make any other presumption less probable, the offence is sufficiently established.    Elwell's Med. Jur. 447.

Roscoe lays down the correct rule, as taken from the opinions in a number of English cases, that, although medical men in many cases cannot positively affirm that death resulted from poison, the accumulative strength of circumstantial evidence may be such as to warrant a conviction; since more cannot be required than that the charge should be rendered highly credible from a variety of detached points of proof, and that, supposing poison to have been employed, stronger demonstrations could not reasonably have been expected.    Roscoe's Cr. Ev. 658.

White, J.    The indictment charges the appellant with the murder, by poison, of one William P. Barton, in the county of Tarrant, on October 14, 1877.    Morphine and laudanum were the poisons alleged to have been used in the perpetration of the crime, and they were administered by being mixed and mingled in beer which was drunk by the deceased.    The indictment was returned into court on March 23, 1878; a copy was served upon defendant on the same day, late in the evening, and defendant was put upon his trial April 3, 1878.    Defendant's conviction for murder in the first degree was the result of the trial, the punishment being death by hanging.

Three prominent questions present themselves in the bills of exception, and they relate, —

1. To the overruling of defendant's application for a continuance.

2. To the charge of the court.

3. The overruling of defendant's motion for a new trial.

With regard to the last, which we will first dispose of, in so far as it was based upon newly discovered evidence, the application was, in our opinion, insufficient. The main object for which the newly discovered testimony was sought was to impeach one of the State's witnesses. The rule is, a new trial will not be granted because of evidence to impeach a witness. *Love* v. *The State*, 3 Texas Ct. App. 501; *Thompson* v. *The State*, 2 Texas Ct. App. 289.

So far as most of the witnesses named in the motion are concerned, the facts stated in the affidavit of accused, and the supporting affidavits of said witnesses, show that by the use of reasonable diligence the testimony might have been known to, and been had by, the defendant. Another rule is, that a new trial will not be granted on account of new evidence, when by reasonable diligence it could have been previously obtained. *Linnard* v. *Crossland*, 10 Texas, 465; *Harmon* v. *The State*, 3 Texas Ct. App. 51.

With regard to the witness Patton, whose testimony is also claimed as newly discovered, it is deposed by defendant that Patton will swear to the facts stated; but he does not state how he knows, or who informed him that he would do so. He should have stated the source of his information (*Brown* v. *The State*, 23 Texas, 195), and thereby have afforded the court an opportunity, if it desired to do so, to inquire into its reliability. For these reasons the court did not err in overruling the motion for a new trial on the ground of newly discovered evidence.

Defendant was put upon his trial on April 3, 1878, ten days after the return of the indictment. His application for a continuance states that on the 25th instant his subpœna for his witnesses, all of whom he swears reside in Tarrant

County, was returned, "with the following indorsement thereon: 'Executed on the 25th day of March, 1878, by reading in hearing of the within named witnesses — Mrs. Jones, J. W. Rahlkey, J. Brewer, Thomas Mahoney, Frank Kinch not found in county.' "

It is contended for the State that none of these witnesses named were served, or found in the county. If this position be correct, it follows that due diligence is wanting to support the application for a continuance, which is made for these witnesses; because it would then appear that, after the return "not found," eight days at least had elapsed before trial, and no additional steps were taken by defendant to secure their attendance. If these identical witnesses were served, or any one of them, then due diligence had been exercised, and the application should have been granted, because it was the first, and came fully up to the requirements of the statute. Pasc. Dig., art. 2987; *Dinkins* v. *The State*, 42 Texas, 250; *Swofford* v. *The State*, 3 Texas Ct. App. 76.

When a witness residing in the county has been served with a subpœna, no other process can issue for his attendance until he has failed to obey the subpœna; until this occurs an attachment cannot issue. Pasc. Dig., arts. 2907–2914. "The amendment to article 435 of the Penal Code, passed May 27, 1873 [Acts 1873, p. 103], does not affect the provisions of article 436; and the amendments to articles 379 and 380 of the Code of Criminal Procedure, contained in 2 Paschal's Digest, articles 6601 and 6602, relate solely to enforcing the attendance of witnesses before the grand juries." *Austin* v. *The State*, 42 Texas, 345.

There is nothing in the record save the return, as copied above, to guide us in solving this question. That does not inform us that there were other witnesses named in the subpœna than those named in the return; nor does the punctuation of the language used in the return throw light upon

the subject.   If we presume that there were other witnesses named in the subpœna, and that they were the ones served, whilst none of those named in the return were, in fact, served, then we might indulge a conclusion contrary to the existence of the facts, and fatally injurious to the rights of a defendant on trial for his life.   On the contrary, is the presumption not more reasonable and just, to say nothing of its humanity, that a party about to be placed upon trial for his life, finding that his material witnesses residing in the county had not been summoned, would have procured other process for them, which, to say the least of it, would have secured a continuance of his trial, if it should fail to procure their attendance?   Pasc. Dig., arts. 1435, 2987. An officer's return on process placed in his hands for execution should not be indefinite.   Such doubts could be easily obviated by showing in the return the names of the witnesses served, and also the names of the witnesses not served.   The return is liable to another objection, viz. : it does not show that the subpœna was " served *by being read to* the witness."   Pasc. Dig., art. 1434.

Before proceeding to inquire into the correctness of the charge of the court, we propose to examine our statutes with reference to "murder by poison," since, so far as we remember, they have never heretofore been directly construed in regard to that offence.   And, first, we will consider the crime as part of and in connection with our general statute defining murder.   The language of this statute is : " Every person, with sound memory and discretion, who shall unlawfully kill any reasonable creature in being within this State, with malice aforethought, either express or implied, shall be deemed guilty of murder. Murder is distinguishable from every other species of homicide by the absence of the circumstances which reduce the offence to negligent homicide or manslaughter, or which will excuse or justify the homicide."   Pasc. Dig., art. 2266.

" All murder committed by poison, starving, torture, or with express malice, or committed in the perpetration, or in the attempt at perpetration, of arson, rape, robbery, or burglary, is murder in the first degree; and all murder not of the first degree is murder of the second degree." Pasc. Dig., art. 2267.

Here we see that the language used is " all *murder committed* by poison," " is murder in the first degree." Not all homicide or killing, because all killing is not murder, nor is all unlawful killing murder; but the offence committed must be *murder*, — murder in its legal, technical sense, — which is made distinguishable from every other species of homicide by being an unlawful killing, actuated by " malice aforethought, either express or implied." This essential ingredient, — " malice aforethought," — is as necessary to constitute the crime of murder by poison as it is to constitute murder committed by any other means. Our Penal Code does not define the meaning of the expression, " malice aforethought." It has, however, been fully defined in the light of common-law authority by our former chief justice, in the celebrated case of *McCoy* v. *The State*, and which definition is now accepted throughout this State as eminently correct.

He says: " In every indictment for murder, the prisoner is charged with having, with malice aforethought, killed the deceased. The proof to sustain this charge under the law may or may not exhibit deliberate malevolence in the mind of the prisoner towards the person killed, though that may be the literal import of the charge, in the ordinary acceptation of the terms used. Hence malice aforethought, when attempted to be defined, has been necessarily given a more comprehensive meaning than enmity, or ill-will, or revenge; and has been extended so as to include all those states of the mind under which the killing of a person takes place without any cause which will, in law, justify, excuse, or extenuate the homicide." 25 Texas, 33, citing *Rex* v.

*Harvey*, 2 Barn. & Cress. 268 ; 1 Hawk. P. C. 95 ; 1 Russ. on Cr. 482 ; Penal Code, art. 607 (Pasc. Dig., art. 2266).

Again, he says : " Express malice is when one, with a sedate, deliberate mind, and formed design, doth kill another. \* \* \* The design formed must be to kill the deceased, or inflict some serious bodily harm upon him. This would indicate that the malevolence must be directed towards the deceased as its object. \* \* \* This design is not confined to an intention to take away the life of the deceased, but includes the intent to do any unlawful act which may probably end in depriving the party of life. Roscoe's Cr. Ev. 707 ; Stark. on Cr. Pl. 711. This specific malevolence towards the person killed may be embraced in such utter and reckless disregard of life as shows a man to be an enemy to all mankind, — as, when a man resolves to kill the next man he meets, and does kill him ; or shoots into a crowd wantonly, not knowing whom he may kill. 4 Bla. Com. 200." *McCoy* v. *The State*, 25 Texas, 33.

Malice express consists in the actual and deliberate intention unlawfully to take away the life of another, or do him great bodily harm. Implied or constructive malice is not a fact, but is an inference or conclusion founded upon the particular facts and circumstances of the case as they are ascertained to exist. *McCoy* v. *The State*, 25 Texas, 33 ; 2 Stark. on Cr. Pl. 711.

Murder in the first degree, then, is constituted when the specific intention is to take the life of the deceased, or to do him some serious bodily harm, the doing of which subsequently results in his death. Without such intention "malice aforethought" is wanting, and if death ensues, whether by poison or other means, it is not murder in the first degree. But if malice aforethought is shown to exist, and the means used be poison, then the killing becomes, under our law, *ipso facto* murder in the first degree. In other words, when murder is committed by poison, the atro-

cious enormity and heinousness of the crime is such that our law-givers have wisely provided it shall consist of no degrees, and shall merit the highest punishment known to the law. We are aware that the doctrine thus declared is not the uniform rule as it obtains in, perhaps, the majority of the American States. This contrariety of decision, however, arises from the difference in the terms of their statutes from those used in ours.

Turning, now, from the general statute of murder, we find that we have a further and additional statute declaring other crimes growing out of the administration of poisonous and injurious potions, and which may in certain contingencies become murder. These statutes read as follows: "If any person shall mingle any poison, or any other noxious potion or substance, with any drink, food, or medicine, with intent to kill or injure any other person, or shall wilfully poison any spring, well, cistern, or reservoir of water with such intent, he shall be punished by imprisonment in the penitentiary not less than two nor more than ten years." Pasc. Dig., art. 2198.

"Art. 2199. If any person shall, with intent to injure, cause another person to inhale or swallow any substance injurious to health, or any of the functions of the body, or if such substance was administered with intent to kill, he shall be punished by confinement in the penitentiary not less than two nor more than five years.

"Art. 2200. If, by reason of the commission of the offences named in the two preceding articles, the death of a person be caused within one year, the offender shall be guilty of murder, and punished accordingly."

Evidently, the object of this statute was to reach a class of cases about which doubts might arise when the general statute of murder was sought to be applied to them. Such doubts were more imaginary than real, in our construction of both statutes. It is to be noted that under these latter

statutes "the intent to kill," or "the intent to injure," are made to stand in lieu of and must be proven just as "malice aforethought" under the general law, which, as we have seen, when explained, means nothing more nor less than the taking of life with intention to do so, or when death results from an intention to do serious bodily harm. In either case, and under this latter, as under the former statute, the malicious intent and its proof are not only the same, but are also the very gist of the offence. So utterly revolting to every sense of humanity is the use of poisons as means of injury to and for the destruction of human life, because of the cool, calculating fiendishness, the deliberate craftiness with which they are administered, and the unsuspecting confidence with which they are necessarily taken by the innocent victim, that the law, in its efforts to suppress it entirely as one of the foulest of all crimes, denounces no half-way penalties against it after it has accomplished the destruction of a reasonable creature in being. Under these last statutes, if death ensues within one year it is murder; and it is murder in the first degree under the express terms of our statutes (art. 2267), because committed by poison.

In the case at bar the indictment was evidently so framed, and properly, we think, in view of the facts, to fit the provisions of article 2200, above quoted. It is good under either or both statutes.

The view of the case taken by the learned judge, as developed in his charge to the jury, was that the case made by the pleadings and evidence was one coming solely under our general statute of murder, *supra*. Under either statute this charge is insufficient. Under the first (arts. 2266, 2267), because it did not explain "malice aforethought," which is the essential ingredient of murder by poison, as of all other murder; the only difference being that in murder by poison the crime is incapable of degrees, and, consequently, is not

subjected to the test or distinction between "express" or "implied malice," ordinarily used to characterize the degree of murder, but would be murder of the first degree in any event, no matter what kind of malice might be shown. Under the other statute (art. 2200) the charge would also be insufficient, in not submitting to the jury, as the essential facts to be ascertained and determined, whether or not the poison was administered "with intent to take life," or "to injure the health or functions of the body" of the person killed.

Again, the charge was error in that it submitted to the jury an issue not made by the indictment. We find this language used in paragraph 2: "All murder committed by poison, and all murder committed *in the perpetration, or attempted perpetration of robbery,* is murder in the first degree." And also, in paragraph 4, the further instruction: "If you find from the testimony that the said poison was so given to the said Barton by the said defendant, either alone or acting with other persons, with the intent on the part of defendant to kill *or rob* the said Barton, then you will find the defendant guilty of murder in the first degree."

In the indictment it is nowhere alleged that the murder was committed in the perpetration of, or attempt to perpetrate, robbery. A charge, to be legal, — that is, to "present the law applicable to the case," — must meet and be limited by the case as set forth and pleaded in the indictment. The charge must conform to and correspond with the allegations. To go outside of and beyond them, in submitting other issues, is not only calculated to mislead the jury, but also calculated to injure the rights of the defendant, by making them depend upon matters he could not be prepared to meet, because he was not notified that they would be urged against him. *Coney*

v. *The State,* 43 Texas, 414; *Kouns* v. *The State,* 3 Texas Ct. App. 13; *Ferguson* v. *The State,* 4 Texas Ct. App. 156.

The seventh and eighth paragraphs of the charge presented the law with regard to accomplices correctly, as the same is provided in article 3118, Paschal's Digest, with the exception that, in paragraph 8, the expression, "connect the defendant with the offence *charged,*" instead of "with the offence *committed,*" is twice used. The statute reads: "A conviction cannot be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the offence committed; and the corroboration is not sufficient if it merely shows the commission of the offence." Art. 3118. See the following cases, in which this article has been discussed and construed: *Dill* v. *The State,* 1 Texas Ct. App. 278; *Irvin* v. *The State,* 1 Texas Ct. App. 301; *Kelly* v. *The State,* 1 Texas Ct. App. 628; *Nourse* v. *The State,* 2 Texas Ct. App. 304; *Davis* v. *The State,* 2 Texas Ct. App. 588; *Gillian* v. *The State,* 3 Texas Ct. App. 132; *Welsh* v. *The State,* 3 Texas Ct. App. 413; *Jones* v. *The State,* 3 Texas Ct. App. 575; *Barrara* v. *The State,* 43 Texas, 260; *Roach* v. *The State,* 4 Texas Ct. App. 46; *Jackson* v. *The State,* 4 Texas Ct. App. 292, 293; and other cases decided at the present term by this court.

It is unnecessary that we should discuss any of the other errors complained of, as none are considered of vital moment. Nor will we discuss the facts proven, or character of the evidence as adduced on the trial and set out in the statement in the record.

For the reasons we have shown, it appearing that the charge of the court did not present the law applicable to the case, the judgment rendered below is reversed and the cause remanded.

*Reversed and remanded.*